THE STATE OF OHIO, APPELLEE, *v.* NEWTON, APPELLANT.

**[Cite as *State v. Newton,* 108 Ohio St.3d 13, 2006-Ohio-81.]**

(No. 2003–0565—Submitted May 11, 2005—Decided January 25, 2006.)

PFEIFER, J.

{¶ 1} Between 4:00 and 5:00 a.m. on November 15, 2001, defendant-appellant, Christopher J. Newton, an inmate at the Mansfield Correctional Institution ("MANCI"), beat and strangled his cellmate, Jason Brewer, causing his death. A grand jury indicted Newton for the aggravated murder of Brewer with prior calculation and design, R.C. 2903.01(A). A single R.C. 2929.04(A)(4) death-penalty specification alleged that Newton had committed the murder while he was under detention.

{¶ 2} Newton waived a jury trial and elected to be tried by a three-judge panel. Newton pleaded guilty as charged, and the state presented evidence establishing his guilt as required by R.C. 2945.06 and Crim.R. 11(C)(3). The panel found Newton guilty as charged. Following a penalty-phase hearing, the panel imposed the death penalty.

### State's Guilt–Phase Evidence

{¶ 3} In June 1992, Newton was sentenced to five to 15 years in prison for attempted aggravated burglary. Within a few weeks of his release on parole in 1999, he broke into his father's house. As a result, his parole was revoked, and he was sentenced to an additional concurrent eight-to-15–year prison sentence. In August 1999, Newton told a mental-health professional that he was going to kill someone in prison so that he could spend the rest of his life in prison.

{¶ 4} On October 16, 2001, Newton, claiming that another inmate had threatened to stab him, requested that he be placed in protective custody. He was assigned to cell 115 with Brewer in a section of MANCI reserved for inmates who request special protection. Brewer was 27 years old, five feet, 11 inches tall, and weighed 130 pounds. Newton was 32 years old, five feet, 11 inches tall, and weighed between 195 and 225 pounds.

{¶ 5} On November 15, 2001, around 5:10 a.m., MANCI correctional officers ("COs") Gregory Ditmars, John Vesper, and Shane Douglas responded to a disturbance in cell 115. Brewer was lying still on the floor in a puddle of blood with a piece of orange cloth wrapped around his neck. Newton was laughing and had blood smeared all over his face. MANCI nurse Trena Butcher testified that when she examined Newton, he told her that he had "painted himself with the victim's blood and had also ingested the victim's blood as part of the ritual when you kill someone."

{¶ 6} MANCI nurse Diane Burson testified that when she responded to cell 115, Brewer was not breathing and had no pulse. Burson and responding paramedics worked diligently, and eventually Brewer's heart began to beat. Ditmars testified that while medical personnel were trying to save Brewer's life, Newton was laughing and yelling, " 'Let him die. I killed him.' " According to Douglas, Newton said, " '[F]uck that bitch [Brewer]. You might as well not even work on him. He is already dead.' " Nurse Butcher recalls Newton periodically shouting to the paramedics, " 'Stop, let the fucker die.' " State Highway Patrol Trooper Doug Hamman described Newton as singing, " '[T]here is nothing like the taste of fresh blood in the morning.' "

{¶ 7} Newton told Ditmars that he had killed his cellmate and had drunk his blood. Vesper recalled Newton's saying that he had killed Brewer by choking him and beating his head on the floor. Douglas testified that Newton said that he had hit Brewer earlier that night and had seen the fear in his eyes and knew he was going to kill Brewer before the night was over.

{¶ 8} After paramedics established a heartbeat, Brewer was taken to MedCentral Hospital, then flown to the Ohio State University Medical Center, where he was declared brain dead around 2:30 p.m. After an autopsy, Dr. Dorothy Dean, a forensic pathologist, concluded that Brewer had died from a ligature strangulation. Brewer also suffered other injuries to his head and body consistent with his having been kicked or stomped on.

{¶ 9} After the assault, Newton told Lieutenant Hilbert Mealey, a MANCI CO, that he had allowed Brewer to lie dead for an hour in the cell because Newton knew that paramedics would try to save his life. Newton told Mealey that he had more fun in prison than on the outside. MANCI Lieutenant Joe Albert recalled that Newton had seemed very happy and had repeatedly asked, " 'Did I kill him?

Is he dead?'" Newton also said, "[I]f he is not dead, I hope he is going to be a vegetable."

{¶ 10} Although Albert did not want to interview him, Newton was adamant about making a statement. Albert advised Newton of his *Miranda* rights, and Newton waived them. Newton described how he had choked and assaulted Brewer starting around 3:45 a.m. Using a razor blade, Newton had cut a strip off an orange jumpsuit and had used that strip to strangle Brewer.

{¶ 11} In Newton's cell, COs found four letters addressed to various prison officials, dated November 14, in which Newton stated that he had lied to obtain protective custody. He stated that his real reason for requesting protective custody was to "take care of a little problem," and the job was now done. Newton authenticated the letters by his bloody fingerprints and referred to himself as "Satan's Messenger, 666."

{¶ 12} On the morning of the murder, November 15, Trooper Smith advised Newton of his *Miranda* rights, and Newton signed a written waiver of those rights. Newton told Smith that another inmate had hired him to beat up Brewer and that at around 10:00 p.m. the previous evening, while he and Brewer were playing chess, they argued, and then he struck Brewer. They both stayed awake, and Newton spent time making a rope so that he could strangle Brewer. Around 3:30 a.m., as Brewer was going to sleep, Newton pulled Brewer out of bed and hit his head against the floor and stomped on his head twice. Newton then strangled Brewer with the rope he had made, until it broke. Newton punched Brewer in the face a few times and then cut a strip off a prison jumpsuit and strangled Brewer with it. Then Newton stomped on Brewer's head again.

{¶ 13} Although Brewer begged, "Please don't kill me," Newton estimates that he stomped Brewer's head with his foot between five and ten times. He also stomped on his throat and chest a few times. After Newton finished assaulting Brewer, he smeared Brewer's blood on his face and licked the blood off his hands. After 30 minutes or so, he called to a CO and said, "[W]elcome to the house of death!" Newton also stated that he knew he would die in prison and hoped for the death penalty.

{¶ 14} On November 18, Newton wrote an 11–page letter relating details of the murder. In a Highway Patrol interview on November 19, 2001, Newton admitted that he had lied in claiming that an inmate had hired him to assault Brewer. He had never met or heard of Brewer before they were placed in the cell together. Newton said that he and Brewer had been sexually intimate, and that when he woke up Brewer that night, he had said, "Jason, come here. I'm horny." According to Newton, Brewer ignored him, which made Newton angry. Although Newton had already decided to kill Brewer, he said that he "needed that kicker [the refusal] * * * to start, start the rage."

{¶ 15} At the guilt phase of the trial, Newton, after pleading guilty, presented no evidence.

### Defense Penalty–Phase Evidence

{¶ 16} At the penalty phase, the defense asserted that Newton's background and his mental illness were mitigating factors.

{¶ 17} Newton's brother David Newton and his sister, Lisa Newton, described Newton as the youngest of five sons and one daughter born to Jean and Lynn Newton. Their parents worked opposite shifts, and their mother operated an antique store and was frequently gone. Their parents communicated with each other only by yelling or arguing. Their father was strict and imposed discipline with a belt, but their permissive mother did not follow through on punishments that had been imposed.

{¶ 18} According to David, their father had little patience with Newton, whom David described as a "lost and disturbed" child with "bizarre" behavior. Newton was impulsive, and his very few friends were "misfits." Newton's mother spoiled the children and was overprotective, particularly with Newton. Whenever Newton misbehaved, their mother always blamed the other children.

{¶ 19} The children used drugs and drank heavily. David testified that he "was in fights continuously all through junior high" and took drugs and drank heavily for years. But David admitted that none of his other siblings were in prison and that they all worked for a living.

{¶ 20} Lisa describes the Newton family household as constantly in turmoil, with verbal, physical, and mental abuse and arguing. Their mother was very religious but very lenient, and their father was very harsh, imposing discipline in the house by severely whipping the children with a belt. Because their parents were frequently absent, the children did whatever they wanted. Lisa also testified that her father had abused her sexually when she was a teenager.

{¶ 21} Newton was different from the other children when he was growing up, and he started getting into trouble at a very early age. When the family went on vacation, they left Newton to stay with their grandmother. The other children called Newton "Pyro" because he had set their home on fire when he was five or six years old, causing the family to live elsewhere for six months.

{¶ 22} Lisa claimed that because of her childhood, she has been in counseling for many years. She admitted that despite inconsistent parenting, their parents worked steadily and provided food and shelter for their children. Their mother also tried to get treatment for Newton at different facilities while he was growing up.

{¶ 23} Between the ages of 13 and 15, Newton attended the Barker Alternative School in Sandusky, Ohio, which educated children with severe behavioral or emotional problems. Mary Churchwell, then a teacher's aide at the alternative school, recalled that Newton had been very impulsive and "thrived on being different and * * * being the class clown, so he didn't form any lasting relationships." Newton also engaged in bizarre behavior and laughed at inappropriate times. At times, Newton was withdrawn, and at other times, he acted silly. Churchwell said that she had noticed that Newton began to "pattern himself after another student who claimed to believe in Satan worship."

{¶ 24} Toni Deluca, a counselor at the school, also described Newton as "the class clown." Although Newton was not violent or physically aggressive, he never fit in with other children. Newton's parents were not involved in his schooling, and Churchwell and Deluca never met them. Newton left the school suddenly in 1985.

{¶ 25} Records at the Berea Children's Home, a juvenile-detention facility, indicate that Newton, then 15½ years old, was admitted for residential treatment in May 1985 at the direction of the juvenile court. The records note that Newton's "past behavior in society was not only unacceptable but bizarre, threatening, and aggressive. * * * His history of sexual acting out was of great concern." Newton was released to attend a regular high school six months later, having "shown marked improvement." His grades, classroom behavior, anger, and interaction with peers had all improved, and an aftercare plan had been developed with the assistance of his parents.

{¶ 26} Dr. Janice Ort, a clinical psychologist, completed a psychological evaluation of Newton based on interviews, testing, and a comprehensive review of relevant records. Dr. Ort noted that Newton had been "socially, emotionally, and physically immature" throughout his childhood. She testified that according to Newton and his siblings, Newton had been "spoiled rotten" by his mother, who rescued him from any consequences for his acts. His father had been physically abusive and perhaps sexually abusive. At various times in his life, Newton claimed that his father had sexually abused him, but at other times, he denied it. Newton was also bullied by his older siblings. Newton told Ort that he had been sexually abused by one of his brothers when he was five and by a neighbor when he was 11.

{¶ 27} While growing up, Newton developed severe behavioral problems, including sexual acting out, theft, and drug and alcohol abuse. The Berea Children's Home had identified him as a very high-risk youth. Newton told Ort that as a teenager, he devoted himself to satanic groups and activities. In 1988, when Newton was 19, he was arrested in Florida for burglary and grand theft. In 1990, 1991, and 1992, he was arrested again for various offenses. Newton was

incarcerated from 1992 until 1999, was briefly out on parole, and was then returned to prison.

{¶ 28} According to Dr. Ort, Newton has an average IQ, with tests indicating an overall IQ of 106. The Minnesota Multiphasic Personality Inventory indicated that Newton has a borderline-personality disorder. In Dr. Ort's view, the tests show that Newton came from a "disruptive, chaotic, abusive, and identity damaging childhood."

{¶ 29} But Dr. Ort recognized that Newton is not a reliable historian of his past. He often lies. For example, Newton claimed to have killed 180 people in satanic rituals, he claimed that his father had died (his father is still living), he falsely claimed that while growing up, he had been playing Russian roulette with a revolver when two children were killed, and in 1999, he falsely reported a plot to explode a bomb at Times Square on New Year's Eve.

{¶ 30} Dr. Ort conceded that over the years, particularly from 1995 to 1999, numerous psychiatrists and psychologists had diagnosed Newton with a variety of psychiatric and mental disorders. Nonetheless, Dr. Ort concluded that Newton was a malingerer. Her conclusion was based on current psychological test data, the observations of mental-health professionals over seven years, and Newton's own admissions that he had falsely reported hearing voices or other psychotic symptoms. Dr. Ort said that, at times, Newton may have attempted to downplay his problems, since he does not want to be seen by others as "damaged" or mentally ill.

{¶ 31} According to Dr. Ort, a Rorschach test indicated that Newton has a "significant affective disturbance [which is] basically a mood disorder typically characterized by depression symptoms or symptoms of mania." Dr. Ort also diagnosed Newton as suffering from polysubstance abuse, a condition that is in complete remission due to Newton's controlled environment; symptoms of post-traumatic stress disorder ("PTSD"); and a personality disorder with borderline, antisocial, and narcissistic features. In Dr. Ort's view, these conditions collectively represent a severe mental disorder. Newton also has a history of suicide attempts and self-mutilation. But Dr. Ort agreed that Newton does not have a thought disorder and displays no psychotic symptoms or delusions.

{¶ 32} At the defense's request, the court accepted into evidence voluminous institutional records relating to Newton. These include a report on a physical and mental examination in September 1999 at the Massillon Psychiatric Center, psychiatric treatment notes for 1992 and 1995 through 2002, medical records from Newton's July 2002 hospital stay for a drug overdose and attempted suicide, hospitalization records from November 28, 2002, to December 2, 2002, for a drug overdose, and psychiatric treatment records for December 6, 2002, to January 3, 2003, from the Oakwood Correctional Facility.

{¶ 33} At least two items are noteworthy. In February 2001, Dr. Arthur Keith, a prison psychiatrist, concluded that Newton was not seriously mentally ill, but was malingering. He diagnosed Newton as having an antisocial-personality disorder and a substance-abuse disorder that was in remission. Dr. Keith found that Newton had no mental illness that would reduce his responsibility for his misconduct and that no mental-health services or medication was required. Further, the diagnosis of Newton on his discharge from Oakwood in January 2003 was major depression, recurrent, but in remission; PTSD; polysubstance dependence; and a personality disorder (with antisocial traits). The Oakwood records reflect Newton's admission that "he never really had hallucinations and he certainly did not have them at this time."

## Prosecution's Penalty–Phase Rebuttal Evidence

{¶ 34} Carol Mull, a licensed independent social worker at MANCI, has known Newton for several years. Mull testified that Newton, throughout his incarceration, has repeatedly claimed to be mentally ill, but then he would later "recant and say he had told us different things * * * because he wanted to fake a mental illness in order to achieve something else." He liked the psychiatric-treatment unit better than regular prison. He has frequently claimed to hear voices, and he is attention-seeking and manipulative. Mull said that Newton has been refusing medication since December 1999. She also testified that Newton appears to derive pleasure from his notoriety over the murder and continually asks for a cellmate. She said that Newton had been involved in a prison dog-training program before October 2001 and during that time he was very well behaved, stable, and not on medication. Newton currently takes no medication and is stable, and Mull described him as "always smiling and laughing."

{¶ 35} Dr. Miles Oden, a board-certified psychiatrist employed at MANCI, evaluated Newton in December 2001, three weeks after the murder. Oden noted that Newton had a history of psychiatric treatment because he had reported auditory hallucinations. But Oden testified that Newton had later admitted that he had fabricated symptoms "so he could obtain psychotropic medications, which made him feel high." Oden also said that Newton admitted that he has a habit of telling lies and then he starts to believe his lies after a period of time.

{¶ 36} When Dr. Oden examined Newton in December 2001, Newton was in good health. His thoughts were orderly and his mood was good. He showed no evidence of psychosis, no bipolar condition, and no mood disorder. In Dr. Oden's view, Newton had no significant mental illness that was present at the time of the murder. Although Newton is at risk for self-destructive behavior, Dr. Oden found no reason to treat him with any medication. Dr. Oden also found no evidence that Newton had a thought disorder or psychosis or any difficulty

understanding reality. However, Dr. Oden did diagnose Newton as suffering from polysubstance dependence in remission and a mixed personality disorder with antisocial and borderline traits. In Dr. Oden's view, Newton's personality disorder explains his erratic behavior.

{¶ 37} Dr. Oden noted that when he saw Newton in December 2001, Newton seemed proud of the murder that he had committed three weeks earlier and took "a certain amount of gruesome pleasure at his notoriety." When Dr. Oden saw Newton on the anniversary of the murder, November 15, 2002, Newton had made a party hat and a blowout toy to celebrate the anniversary. Dr. Oden reported that Newton appeared happy and was wearing the hat and making jokes about celebrating the anniversary of the murder.

{¶ 38} Defense counsel cross-examined Dr. Oden about Newton's medical records from November 1995 to May 2000, which reflected repeated placements in psychiatric-treatment units and past diagnoses of serious mental illnesses such as a schizoaffective disorder, bipolar disorder, a mood disorder, and PTSD. Dr. Oden, however, believed that Newton could have fooled the mental-health professionals who made these diagnoses. Dr. Oden noted that the diagnoses were based on Newton's false reports of symptoms such as auditory hallucinations. In fact, Newton has a well-documented history of malingering and falsely reporting hallucinations. Further, Newton functioned well as a dog handler in 2001 without any medication, and that fact negated finding a schizoaffective disorder.

{¶ 39} Dr. Renee Sorrentino, a forensic psychiatrist, examined Newton's mental-health and prison records in depth. Dr. Sorrentino summarized in a comprehensive report Newton's history in various institutions, Dr. Ort's findings, and her own conclusions regarding Newton's mental state. Dr. Sorrentino asked to interview Newton, but was refused access by Newton's attorneys.

{¶ 40} In Dr. Sorrentino's view, any earlier diagnosis that Newton suffered from a schizoaffective disorder "was not correct * * * because * * * Newton did not have auditory hallucinations. He made them up." She explained that a schizoaffective disorder is not curable and does not go away. Further, Dr. Sorrentino concluded that Newton does not have sufficient symptoms to support a diagnosis of a PTSD. Nor do Newton's records reflect criteria to find a major depressive disorder. Dr. Sorrentino's report indicates that she is unclear on the meaning of Dr. Ort's diagnosis of a "mood disorder overlaying * * * a personality disorder." Dr. Sorrentino believes that Newton's mood symptoms are characteristics of his personality disorders.

{¶ 41} In Dr. Sorrentino's opinion, Newton was never psychotic, never lost touch with reality, and has no symptoms of psychosis. In fact, psychological testing indicated "no psychotic process, no impaired reality." Dr. Sorrentino believes that the earlier diagnosis of a bipolar disorder was simply incorrect

because Newton made up symptoms. Newton admitted to Dr. Ort that he had read psychology texts and case studies in order to discover how to fake symptoms of mental illness. Further, Dr. Sorrentino said that the way that Newton described hearing voices was simply "not characteristic of what psychotic patients experience."

{¶ 42} Dr. Sorrentino did agree that Newton has a polysubstance-abuse disorder, which is in full remission because he is in a controlled environment, a documented history of malingering of auditory hallucinations and suicidal intent (although sometimes he actually is suicidal), and an antisocial-personality disorder and borderline-personality traits.

{¶ 43} Dr. Sorrentino also noted that antisocial-personality disorder occurs in 60 to 70 percent of male prisoners, substance-abuse disorder occurs in 85 percent of male prisoners, and borderline-personality disorder appears in about 60 percent of male prisoners.

{¶ 44} Newton now appeals to our court as a matter of right and presents nine propositions of law for our consideration. We find no merit in any of his propositions. Hence, we affirm the findings of guilt. We have independently weighed the aggravating circumstance against the mitigating factors and have considered the appropriateness of the death sentence. For the reasons that follow, we affirm the judgment of the trial court, including the death sentence.

### Trial Court's Imposition of Death Penalty (Proposition of Law I)

{¶ 45} In proposition of law I, Newton contends that the trial court misunderstood the capital-sentencing process, improperly considered nonstatutory aggravating circumstances, and wrongfully excluded relevant mitigating evidence.

{¶ 46} First, Newton argues that the trial court misunderstood the capital-sentencing process. We find, however, that the record does not support Newton's claim. The trial court's shorthand reference to mitigation canceling out aggravation demonstrates only that a trial court sometimes refers to the weighing process in abbreviated terms. The trial court's sentencing opinion demonstrates its understanding of the prosecution's burden to prove that the aggravating circumstance outweighs mitigating factors beyond a reasonable doubt before the death penalty can be adjudged. The colloquy between counsel and the three-judge panel as to which evidence was relevant to the aggravating circumstance—murder while the defendant was an inmate—and the weighing process reflected only the trial court's effort to understand counsel's view of the capital-sentencing process.

{¶ 47} Second, Newton urges that the trial court erred in failing to ignore the facts surrounding the aggravating circumstance. At trial, the defense counsel also asked the trial court to weigh the aggravating circumstance against mitigat-

ing factors abstractly, without giving any consideration to the facts surrounding the aggravating circumstance. The trial court correctly rejected the defense request and relied upon our opinion in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311. As we explicitly recognized in *Wogenstahl,* "R.C. 2929.03(D)(1) requires that the trial court and jury 'hear' testimony and other evidence that is relevant to the *nature and circumstances of the aggravating circumstances the offender was found guilty of committing.*" (Emphasis sic.) Id. at 353, 662 N.E.2d 311. Accord *State v. Stojetz* (1999), 84 Ohio St.3d 452, 464, 705 N.E.2d 329. In *State v. Hill* (1996), 75 Ohio St.3d 195, 661 N.E.2d 1068, we explicitly made this point: "We will not interpret Ohio's capital sentencing statute to require a jury to make its recommendation between life and death in a factual vacuum. * * * We will not sanction a procedure by which counsel for a criminal defendant is provided full opportunity to vigorously argue the full range of mitigating evidence * * * while his adversary, the prosecutor, is precluded from vigorously arguing the entire scope of facts surrounding the act of murder of which the defendant has been convicted. * * * *In short, a capital defendant in Ohio is not statutorily or constitutionally entitled to protection during the sentencing process from the facts he himself created in committing the crime.*" (Emphasis added.) Id. at 201, 661 N.E.2d 1068.

{¶ 48} Thus, at trial, Judge DeWeese correctly stated, "Against [mitigating factors], we have to weigh the facts of the aggravating circumstance. We don't weigh simply the fact that it happened in a prison." At a later point, counsel and the court clarified any possible confusion as to whether the facts of the offense were an aggravating circumstance, as the following illustrates.

{¶ 49} "MR. ROBINSON [Prosecuting attorney]: * * * Also, for the record, I believe that the Court misstated the law earlier yesterday by saying that the * * * murder could be considered as an aggravating circumstance. That is not correct. * * * [T]he only thing that can be considered as an aggravating circumstance is the fact that he was found guilty of the spec[ification]. * * *

{¶ 50} "JUDGE DEWEESE: I don't think anyone said that. They said the aggravating circumstance was the murder occurred in the prison, and we need to weigh the facts of that against the mitigating factors that the Defendant has proved here.

{¶ 51} "MR. ROBINSON: Correct. I just wanted to be sure we got it on the record. Do you agree?

{¶ 52} "MR. DAVIS [defense counsel]: Yes."

{¶ 53} Because the facts surrounding an aggravating circumstance are relevant in the weighing process, the trial court correctly applied the applicable governing law. *State v. Wogenstahl,* 75 Ohio St.3d at 353, 662 N.E.2d 311; *State v. Hill,* 75 Ohio St.3d at 201, 661 N.E.2d 1068; *State v. Gumm* (1995), 73 Ohio St.3d 413, 653

N.E.2d 253, syllabus. We reject Newton's claim that the trial court should have considered the aggravating circumstance in a vacuum, without reference to the surrounding facts.

{¶ 54} Third, Newton argues that the trial court's opinion reflects that the trial court relied on nonstatutory aggravating circumstances by referring to the nature and circumstances of the murder as justification for finding that the aggravating circumstance outweighed the mitigating factors. However, Newton is wrong, since the facts referred to related to the aggravating circumstance. For example, Newton and Brewer were both inmates in protective custody in a maximum security prison, and yet Newton attacked his cellmate and killed him.

{¶ 55} We have explicitly recognized that "the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A) * * * that have been alleged in the indictment and proved beyond a reasonable doubt." *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph one of the syllabus. Accord *State v. Johnson* (1986), 24 Ohio St.3d 87, 24 OBR 282, 494 N.E.2d 1061, syllabus.

{¶ 56} Further, when a trial court correctly identifies the aggravating circumstance, as the trial court did here, "that court is presumed to rely only on that circumstance, and not on nonstatutory aggravating circumstances." *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271. Accord *State v. Clemons* (1998), 82 Ohio St.3d 438, 447, 696 N.E.2d 1009; *State v. Rojas* (1992), 64 Ohio St.3d 131, 142, 592 N.E.2d 1376. Here, the trial court correctly identified the aggravating circumstance and fully explained why it found that the aggravating circumstance outweighed the mitigating factors. Thus, the trial court did not rely upon the facts of the offense as a nonstatutory aggravating circumstance, as Newton claims.

{¶ 57} Fourth, contrary to Newton's argument, the trial court did not err by describing the aggravating circumstance as "very serious." When weighing the aggravating circumstance, the trial panel was entitled to consider the nature of the circumstance. R.C. 2929.03(D)(1). When a prisoner deliberately kills another, that murder directly challenges the state's authority to regulate public order and protect its citizens by segregating those who have committed serious crimes. Moreover, in weighing the appropriateness of the death penalty, we have also commented on the relative severity of a particular aggravating circumstance. See, e.g., *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 129 ("by his acts [defendant] has demonstrated that he is a menace to the life, health, and safety of others, even when he is in prison"); *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 144 (defendant's "course of conduct

in multiple killings during the course [of a burglary] is a grave aggravating circumstance").

{¶ 58} Fifth, Newton argues that the court was confused about the purpose of mitigation evidence. But the trial court did not demonstrate confusion as to the purpose of mitigation by asking defense counsel, "[W]hy is a mood disorder NOS [not otherwise specified] a mitigating factor?" Defense counsel at trial clarified the point by conceding that counsel was not claiming any causal relationship between the disorder and the offense. Moreover, the court fully considered Dr. Ort's testimony for the mitigating value of Newton's mental condition.

{¶ 59} The defense's claim that the trial court did not give appropriate weight to mitigating evidence confuses admissibility of evidence with mitigating weight. As we recognized in *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, in paragraph two of the syllabus, "While R.C. 2929.04(B)(7) evinces the legislature's intent that a defendant in a capital case be given wide latitude to introduce any evidence the defendant considers to be mitigating, this does not mean that the court is necessarily required to accept as mitigating everything offered by the defendant and admitted. The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight." Further, we emphasized in *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, that "the assessment and weight to be given mitigating evidence are matters for the trial court's determination." Accord *State v. Taylor* (1997), 78 Ohio St.3d 15, 31, 676 N.E.2d 82; *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124.

{¶ 60} Sixth, Newton claims that the trial court "excluded relevant mitigating evidence," but that claim is wrong. The panel was aware of Newton's guilty plea, and its decision to give his guilty plea less weight than Newton argues it deserves is not equivalent to excluding the plea from evidence. "A decisionmaker need not weigh mitigating factors in a particular manner. The process of weighing mitigating factors, as well as the weight, if any, to assign a given factor is a matter for the discretion of the individual decisionmaker." *State v. Fox*, 69 Ohio St.3d at 193, 631 N.E.2d 124, citing *State v. Mills* (1992), 62 Ohio St.3d 357, 376, 582 N.E.2d 972. The same principle applies to the trial court's assessment of evidence that Newton secured a GED certificate, participated in the prison honors program as a dog handler, and was sexually abused as a child. See *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus; *State v. Lott*, 51 Ohio St.3d at 171, 555 N.E.2d 293.

{¶ 61} Newton also claims that the trial court misconstrued relevant mitigating evidence by regarding Newton's parents as "substantially normal" and ignoring his father's severe discipline and his mother's leniency. He claims that the court erred in ignoring his "loner" status within the family. But again, Newton's

claims are meritless. The trial court's evaluation of the evidence as to Newton's childhood and upbringing was a matter within the trial court's discretion. The trial court was aware of this defense evidence and gave it the weight that the court believed was appropriate. Newton received a fair penalty-phase hearing and a fair sentence.

### Appropriateness of the Death Penalty (Proposition of Law II)

{¶ 62} In proposition of law II, Newton argues that the death sentence must be vacated because the aggravating circumstance did not outweigh the mitigating factors. We will consider this argument during our independent review of the mitigating evidence and the sentence.

### Funds for Neuropsychiatric Testing (Proposition of Law III)

{¶ 63} In proposition of law III, Newton argues that "the trial court's failure to grant funds for neuropsychiatric testing" denied him rights guaranteed by statute, as well as due process rights guaranteed by the United States Constitution and the Ohio Constitution. In *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, at the syllabus, we recognized that "[d]ue process * * * requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." See, also, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus; R.C. 2929.024.

{¶ 64} Before trial, the defense requested, and the trial court authorized, funds for the defense to have expert assistance to prepare for trial. For example, the court authorized an investigator for up to 200 hours at $20 per hour, a defense psychologist, Dr. Ort, and a defense psychiatric expert, Dr. Douglas Mossman.

{¶ 65} In December 2002, the defense requested additional funds for "neuropsychiatric tests." According to Dr. Mossman's accompanying affidavit, these tests would "elucidate and help explain Mr. Newton's impulsiveness and alleged criminal behavior." Dr. Mossman asserted that the tests would "make it possible to diagnose and document the kinds of brain-based abnormalities *from which [Newton] may suffer* and the sources of his impulsiveness." (Emphasis added.) The tests that Dr. Mossman wanted to conduct included:

{¶ 66} "(a) a sleep-deprived EEG with true temporal leads;

{¶ 67} "(b) a lumbar puncture to sample cerebrospinal fluid (CSF), which would permit determination of CSF levels of cells, protein, glucose, testosterone and 5–

hydroxyindoleacetic acid (5–HIAA), homovanillic acid (HVA), and norepinephrine (NE), with simultaneous salivary cortisol and blood testosterone levels;

{¶ 68} "(c) a positron emission tomographic (PET) study of Mr. Newton's brain, using radiolabeled, injected flouorodeoxyglucose, with accompanying magnetic resonance imaging (MRI)."

{¶ 69} The trial court denied the requested additional funding, since Newton did not then claim any mental disease or defect under R.C. 2929.04(B)(3) and these tests had not been utilized in other Ohio death-penalty cases. In the court's view, the tests lacked relevancy, since Newton's brain chemistry at the time the test would be administered, December 2002, may have been quite different from what it had been in November 2001, when the murder was committed.

{¶ 70} In a motion requesting the court to reconsider the denial of funds for these tests, the defense pointed to literature indicating a link between low levels of the brain chemical serotonin and deficient impulse control, leading to pyromania, suicide, and severe aggression. The trial court also reviewed the literature regarding serotonin levels in the brain and expressed skepticism as to the value of such tests. In urging his motion for reconsideration, Newton asserted that the tests might provide mitigating evidence under R.C. 2929.04(B)(7) ("any other factor"). The court again denied funds.

{¶ 71} In our view, the trial court did not abuse its discretion, because Newton did not establish that these tests related to any issue in this case. Newton's claim that a low serotonin level is related to impulsivity simply did not matter, since Newton failed to demonstrate that tests performed in December 2002 could be useful in determining Newton's brain chemistry in November 2001, when the offense occurred. This is true particularly because Newton attempted suicide twice after November 2001 by taking an unknown quantity and type of psychotropic drugs. As the trial court noted, "[W]e are many months away from the event in question and no one can perform a test now to determine what defendant's chemical makeup was well over one year ago. Defendant's chemical makeup today being affected by what he has eaten, the drugs he has consumed and many other factors, any tests performed now would be irrelevant and not material to what his chemical makeup may have been at the time of the event in question."

{¶ 72} In a hearing on the motion requesting funds for these tests, the trial court asked Dr. Mossman to explain the possible effect of psychotropic drugs that Newton ingested after November 2001 on any test results. But the record shows that the trial court was not satisfied with Dr. Mossman's conclusion that the test might provide "potentially" useful information.

{¶ 73} As we held in *State v. Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, at the syllabus, due process requires that funds be approved "only where the trial court

finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense." In the trial court's view, Newton failed to make a particularized showing. We find no abuse of discretion by the trial court. Cf. *State v. Hughbanks,* 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 44–46 (no particularized need demonstrated for neuropharmacologist); *State v. Campbell* (2000), 90 Ohio St.3d 320, 327–328, 738 N.E.2d 1178 ("mere possibility that the [specialized chest X-ray] could have had some [mitigation] value to the defense was not enough").

{¶ 74} Moreover, Newton has not satisfied the second requirement of the syllabus in *Mason,* namely, "that denial of the requested expert assistance would result in an unfair trial." Newton argues that "[n]europsychiatric testing would indicate Newton's serotonin levels and whether there is a connection to his impulsive behavior; which leads to an explosive disorder, suicidal tendencies, and severe unrestrained aggression."

{¶ 75} However, Newton's claim of prejudice is purely speculative, and his claim of impulsiveness lacks relevance. The facts and Newton's own explanations of the murder demonstrate that Newton's decision to kill Brewer was planned and calculated. For example, Newton spent time making a rope with which to strangle Brewer. Newton also wrote letters to prison officials in advance, explaining his decision to kill Brewer. He also told others that he planned to kill a fellow inmate so that he could remain in prison.

{¶ 76} Finally, Newton's right to a fair trial was not compromised, because the trial court had other extensive evidence of Newton's asserted psychiatric problems, including volumes of psychiatric records. Dr. Ort testified, and Dr. Mossman, a psychiatrist, could have testified on Newton's behalf. Thus, "[c]ounsel had 'alternative devices that would fulfill the same functions as the expert assistance sought.' " *State v. Hughbanks,* 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 46, quoting *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. See, also, *State v. Nields* (2001), 93 Ohio St.3d 6, 12, 752 N.E.2d 859 (neuropsychologist not needed in view of availability of psychiatrist); *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 150–152, 749 N.E.2d 226 (neuropharmacologist not needed in view of availability of other experts). Tests showing Newton's serotonin levels over a year after the murder would have been of marginal significance. Thus, Newton has failed to demonstrate that he was prejudiced. Therefore, we reject proposition of law III.

### *Execution of Severely Mentally Ill Person (Proposition of Law IV)*

{¶ 77} In proposition of law IV, Newton argues that he is severely mentally ill and thus, executing him would be cruel and unusual punishment, which is

prohibited by the Eighth Amendment to the United States Constitution. However, we reject Newton's proposition of law IV.

{¶ 78} The issue of Newton's mental competency to be executed is premature. He does not allege that he has a permanent condition, such as mental retardation, that would make his execution unconstitutional. See *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. While the Constitution also forbids the execution of a person who is insane at the time of execution, *Ford v. Wainwright* (1986), 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335, Newton is entitled to pursue postconviction remedies, as well as a federal habeas writ, and thus his execution will be years away. See *State v. Steffen* (1994), 70 Ohio St.3d 399, 639 N.E.2d 67. It is entirely too early to speculate on what Newton's mental condition will be years from now. At this point, the most appropriate consideration of Newton's mental condition is his status at the time of the offense, for purposes of mitigation. We undertake that analysis in our independent sentence evaluation, below, and conclude therein that Newton did not establish by credible evidence at trial that he suffers from a severe mental illness. Thus, whether to exempt the severely mentally ill from execution is not a relevant issue in this case.

{¶ 79} In sum, Newton's claim that his death sentence should be reversed because he suffers from serious mental illness lacks merit. Therefore, we reject proposition of law IV.

### Waiver of Jury Trial (Proposition of Law V)

{¶ 80} In proposition of law V, Newton argues that his jury-trial waiver was invalid because the trial court failed "to properly apprise [Newton] of the jury's role in the penalty phase." Newton also argues that he was "affirmatively misinformed about the jury's role in the penalty phase."

{¶ 81} We find, however, that Newton's arguments lack merit. In *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, at paragraph one of the syllabus, we held: "There is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." Further, "[t]he Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel." Id. at 26, 559 N.E.2d 464. Accord *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 38–56; *State v. Spivey* (1998), 81 Ohio St.3d 405, 408–409, 692 N.E.2d 151.

{¶ 82} Nonetheless, Newton argues that the trial court was required to give him special advice on a jury-trial waiver because "[a] capital jury operates with special features," such as the fact that "a solitary juror may prevent the death

penalty" or that jurors need not be unanimous when determining the weight to give specific mitigating factors. But we rejected similar claims in *State v. Bays* (1999), 87 Ohio St.3d 15, 19–21, 716 N.E.2d 1126, citing *United States v. Martin* (C.A.6, 1983), 704 F.2d 267, 274, fn. 8. In *Bays,* we noted that "a defendant need not have a complete or technical understanding of the jury trial right in order to knowingly and intelligently waive it." Id. at 20, 716 N.E.2d 1126. And "[t]he trial court is not required to inform the defendant of all the possible implications of waiver." Id. Accord *Sowell v. Bradshaw* (C.A.6, 2004), 372 F.3d 821, 833–834; *State v. Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 44–49 (accused need not be told that a jury's finding of guilt and recommendation of a death sentence must be unanimous). See, also, *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 238, 714 N.E.2d 867 (accused need not be advised of "presumption of correctness that will attach to the findings of the three-judge panel"); *State v. Baston* (1999) 85 Ohio St.3d 418, 422, 709 N.E.2d 128 (colloquy on the standard of review that would apply on appeal not needed).

{¶ 83} In this case, the record shows that Newton voluntarily signed and filed a jury waiver declaring the following: "Christopher Newton * * * represents to the court that he is aware and cognizant of his right to a trial by jury consisting of twelve (12) citizens * * * and hereby waives that right. The defendant, Christopher Newton, pursuant to law, elects to be tried by a three (3) judge panel." During a subsequent court hearing, Newton signed another jury waiver that was filed.

{¶ 84} At the hearing to accept the waiver, the trial court made sure that Newton understood his rights. The trial court advised Newton that a special venire had been called, that he could have a jury of 12 decide his case, that he was presumed innocent, that the state had to prove his guilt beyond a reasonable doubt, and that it was entirely his decision whether to be tried by a jury or before three judges. The trial court also explained his right to confront witnesses, subpoena witnesses, and to testify or not, as he chose. Newton acknowledged that he understood his rights. The court also noted:

{¶ 85} "THE COURT: All 12 jurors have to find you guilty or not guilty. * * * We tell them that less than a unanimous verdict is a hung jury and no verdict at all. The jury doesn't determine punishment. * * * They recommend punishment. The final word on punishment in these kinds of cases is determined by the Court. The jury does, in fact, make a recommendation * * *. [I]f they find you guilty, they have a second hearing at which time the jury gets to decide what they recommend as a sentence. Ordinarily what they recommend is what the Court does. Now, any part of that you don't understand?

{¶ 86} "MR. NEWTON: No, sir."

{¶ 87} Based on the foregoing, Newton contends that the trial court "affirmatively misinformed [him] about the jury's role in the penalty phase" by referring to the jury's verdict as a "recommendation." But "the term 'recommendation' * * * accurately reflects Ohio law." *State v. Jones* (2000), 90 Ohio St.3d 403, 418, 739 N.E.2d 300. Accord *State v. Robb* (2000), 88 Ohio St.3d 59, 84, 723 N.E.2d 1019. Further, counsel did not object to the explanation, and Newton did not ask for further clarification.

{¶ 88} Newton signed his waiver in open court, and that signed waiver is in the record. Pursuant to *Jells,* no more was required. Accord *Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 43; *Bays,* 87 Ohio St.3d at 20, 716 N.E.2d 1126. Based on the foregoing, we reject proposition of law V.

### Prosecutorial Misconduct (Proposition of Law VI)

{¶ 89} In proposition of law VI, Newton argues that the prosecutor's misconduct during the penalty phase denied Newton his due process right to a fair trial and a reliable sentencing determination.

{¶ 90} First, Newton argues that the prosecutor "improperly introduced irrelevant evidence to show that Newton had no remorse for the killing of his cellmate." Newton cites Dr. Oden's direct testimony describing Newton's celebration of the anniversary of Brewer's murder. But Newton did not object to this evidence and thereby waived all but plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. In this case, we find no outcome-determinative prejudice because judges are presumed to consider only relevant, competent, and admissible evidence in their deliberations. *State v. Davis* (1992), 63 Ohio St.3d 44, 48, 584 N.E.2d 1192; *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754.

{¶ 91} Moreover, there was no obvious error. The testimony related to Newton's asserted mental illness, an issue the defense raised, and Dr. Oden was a rebuttal psychiatric witness. The prosecution is entitled to introduce relevant evidence rebutting defense mitigating evidence. *State v. Raglin* (1998), 83 Ohio St.3d 253, 261, 699 N.E.2d 482; *State v. Gumm,* 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus.

{¶ 92} Second, Newton claims that various penalty-phase closing remarks by the prosecutor amount to prosecutorial misconduct. Whether a prosecutor's remarks constitute misconduct requires analysis as to whether the remarks were improper and, if so, whether the remarks prejudicially affected an accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Accord *State v. Lott,* 51 Ohio St.3d at 165, 555 N.E.2d 293. The touchstone of due process analysis as to prosecutorial misconduct is the "fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455

U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. Again, Newton failed to object to the remarks, and he thereby waived all but plain error. *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754.

{¶ 93} Our review of the record discloses no outcome-determinative plain error. See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. For example, the prosecutor properly argued the severity of the aggravating circumstance of a person committing a murder while incarcerated in a detention facility. The prosecutor was responding to the defense's characterization of the R.C. 2929.04(A)(4) death specification as "the least serious of the aggravating circumstances." A prosecutor can respond to issues raised by an accused. *State v. Awkal* (1996), 76 Ohio St.3d 324, 336, 667 N.E.2d 960; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 491, 653 N.E.2d 304.

{¶ 94} The prosecutor also properly commented on the defense's mitigating evidence by minimizing its significance. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292. Thus, the prosecutor could properly argue that Newton's "personality disorder" did not lessen his "culpability." See *State v. Steffen*, 31 Ohio St.3d at 129, 31 OBR 273, 509 N.E.2d 383 ("Only that evidence which lessens the moral culpability of the offender or diminishes the appropriateness of death as the penalty can truly be considered mitigating").

{¶ 95} The prosecutor properly commented on the positive aspects of Newton's parents and his siblings. *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 98 (prosecutor can compare defendant with law-abiding siblings). The prosecutor could also properly urge that evidence of Newton's dysfunctional family or his antisocial-personality disorder was relatively unimportant. The fact that evidence is admissible as mitigating evidence "does not automatically mean that it must be given any weight." *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, at paragraph two of the syllabus. The prosecutor's comments that psychological evidence established that Newton was "an evil showman" or "a jerk" reflected fair comment on Newton's character, a factor that the trial court must evaluate in determining the appropriateness of the death penalty. See R.C. 2929.04(B). Further, "[t]hese comments were not abusive, but fit within the creative latitude permitted both parties during closing argument." *State v. Bies*, 74 Ohio St.3d at 326, 658 N.E.2d 754. See *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (prosecutors can be "colorful or creative" in argument).

{¶ 96} To support his claim that he was prejudiced by the prosecutor's argument, Newton also refers to the trial court's sentencing opinion. But in rejecting proposition of law I, we have already concluded that the sentencing opinion was fair. For the foregoing reasons, we also reject proposition of law VI.

### Ineffective Assistance of Counsel (Proposition of Law VII)

{¶ 97} In proposition of law VII, Newton points to various examples of purported ineffective assistance of counsel at trial. Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 98} First, Newton claims that his counsel failed to ensure that the trial court obtained a proper jury-trial waiver. But a trial court need not "interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." *State v. Jells,* 53 Ohio St.3d 22, 559 N.E.2d 464, at paragraph one of the syllabus. Nor did the court mislead Newton. For the reasons we discussed in connection with proposition of law V, we find that counsel did not perform deficiently. Nor was Newton prejudiced by his counsel's failure to object to the trial court's inquiry.

{¶ 99} Second, Newton's counsel did not perform deficiently by deciding not to object to the admission of gruesome photographs that were accepted into evidence. The photographs illustrated the testimony of witnesses who described the crime scene and helped to establish the killer's intent. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 342, 703 N.E.2d 1251; *State v. Mason,* 82 Ohio St.3d at 159, 694 N.E.2d 932. These photographs also gave the three-judge panel an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042. The autopsy photographs illustrated the coroner's testimony. The photographs of Brewer receiving medical treatment helped to show the nature and extent of his injuries. Additionally, because this case was tried to a three-judge panel, the judges are presumed not to have been improperly influenced by any gruesome photographs. *State v. Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 66, citing *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65. Accord *State v. Benner* (1988), 40 Ohio St.3d 301, 312, 533 N.E.2d 701.

{¶ 100} Further, because Newton pleaded guilty, he has not demonstrated prejudice, or "a reasonable probability" that without the gruesome photographs, "the result of the trial would have been different." See *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. In fact, Newton's own description of the crime was much more gruesome than the photographs.

{¶ 101} Third, Newton also complains that his counsel were ineffective in not objecting to the readmission of specific guilt-phase exhibits during the penalty phase. Counsel raised a general objection to the admission of all the exhibits, but

when the court asked counsel to name specific exhibits and objections, counsel were not prepared to do so. Then an extended discussion about the aggravating circumstance ensued. The issue was deferred. The parties later renewed the discussion and eventually agreed that the panel could decide which of the guilt-phase exhibits were relevant to the penalty phase.

{¶ 102} In view of these events, counsel made a reasonable tactical decision "under prevailing professional norms" to let the panel of experienced jurists decide which exhibits were relevant to the penalty phase. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. The panel had already seen and examined the exhibits in the guilt phase. Under the circumstances, readmitting the exhibits in the penalty phase was of little consequence.

{¶ 103} Moreover, we recognized in *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542, that repetition of much or all that occurred during the guilt phase would be permissible at the penalty phase, including readmitting trial exhibits such as gruesome photographs. Accord *State v. Fears* (1999), 86 Ohio St.3d 329, 345, 715 N.E.2d 136. See, also, *State v. Steffen*, 31 Ohio St.3d at 117, 31 OBR 273, 509 N.E.2d 383 (under R.C. 2929.04(B), "the court is *required* to review" the nature and circumstances of the offense to determine whether there are any mitigating features [emphasis sic] ). Further, Newton has not demonstrated "a reasonable probability" that if a specific objection had been made to particular trial exhibits, "the result of the trial would have been different." See *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 104} Finally, because no prosecutorial misconduct was involved, counsel did not render ineffective assistance in declining to object to the prosecutor's questioning of the witnesses or the prosecutor's final argument. See our discussion on proposition of law VI. For the foregoing reasons, we reject proposition of law VII.

### *Constitutional Issues (Propositions of Law VIII and IX)*

{¶ 105} In proposition of law VIII, Newton argues that the reference in R.C. 2929.03(D)(1) to the "nature and circumstances of the aggravating circumstances" is unconstitutionally vague because the "nature and circumstances of the offense" is a potential mitigating factor in R.C. 2929.04(B). We summarily reject this claim based on our past decisions. See, e.g., *State v. Stojetz*, 84 Ohio St.3d at 464, 705 N.E.2d 329 (claim that R.C. 2929.03(D)(1) and 2929.04 are unconstitutionally vague, both facially and as applied, lacks merit); *State v. McNeill* (1998), 83 Ohio

St.3d 438, 453, 700 N.E.2d 596 ("We do not find the statutory language [of R.C. 2929.03(D)(1) ], or the concepts it conveys, unconstitutionally vague"). Accord *State v. Wogenstahl,* 75 Ohio St.3d at 352–355, 662 N.E.2d 311; *State v. Hill,* 75 Ohio St.3d at 199–202, 661 N.E.2d 1068. See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus (settled issues can be summarily rejected).

{¶ 106} We also summarily reject Newton's proposition of law IX because, as we have previously held, Ohio's death-penalty statute is constitutional. *State v. Carter* (2000), 89 Ohio St.3d 593, 606–608, 734 N.E.2d 345; *State v. Clemons,* 82 Ohio St.3d at 454, 696 N.E.2d 1009. Finally, we conclude that Newton's international-law challenge lacks merit. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643.

## INDEPENDENT SENTENCE EVALUATION

{¶ 107} After evaluating the evidence, we find that the evidence proves the aggravating circumstance specified in the indictment, namely, R.C. 2929.04(A)(4), that when Newton killed Brewer, Newton was under "detention" as defined in R.C. 2921.01. Newton was an inmate in MANCI, a "public * * * facility for custody of persons * * * convicted of crime in this state." R.C. 2921.01(E).

{¶ 108} As to mitigating evidence, we find that the nature and circumstances of the offense offer no mitigating features. Newton brutally murdered his cellmate by beating and strangling him, and Newton did so after planning the murder. In fact, he had expressed his intention to kill another inmate long before this crime. Newton did not express any particular grievance against Brewer. After he viciously assaulted Brewer, Newton urged paramedics not to attempt to revive his cellmate.

{¶ 109} In contrast, we find that Newton's history and background provide some modest mitigating features. Newton's parents did not provide the nurture and guidance that he needed to grow into a mature, stable adult. Thus, in Dr. Ort's view, Newton had a "disruptive, chaotic, abusive, and identity damaging childhood." Newton's father was unduly harsh, his mother was overprotective, and Newton developed severe behavioral problems as a child and adolescent. Unfortunately, Newton's life as an adult does not merit favorable consideration, since Newton, except for a few weeks in 1999, was in prison for nine years before this offense. But while in prison, Newton did earn a GED certificate and participate in an honors program that prepares dogs for adoption. We find nothing else in Newton's character that warrants favorable consideration.

{¶ 110} Newton did not establish by credible evidence that he suffered from a "mental disease or defect" such that he "lacked substantial capacity to appreciate the criminality of * * * [his] conduct or to conform [his] conduct to the requirements of the law." R.C. 2929.04(B)(3).

{¶ 111} Newton has a well-documented and admitted history as a malingerer. He has falsified psychiatric symptoms so as to appear to have a serious mental disorder in order to receive special treatment and psychotropic drugs. Dr. Ort, Newton's principal witness, conceded this at trial. Carol Mull, a licensed social worker who has known Newton for several years, described his repeated faking of mental illness. Dr. Oden and Dr. Sorrentino both confirmed that Newton repeatedly feigned mental illness. Newton even read psychology texts and case studies in order to convincingly fake symptoms. Because of his documented history of malingering, we regard past diagnoses of psychiatric disorders in his medical records to be of negligible value.

{¶ 112} None of the experts who testified at trial described Newton as exhibiting psychotic symptoms:

{¶ 113} (1) Dr. Ort testified that nothing in her interviews with and tests of Newton supported the view that Newton is psychotic. Newton demonstrated an ability to perceive events, interpret the actions of others without distortion, and anticipate the consequences of his actions.

{¶ 114} (2) When Dr. Oden interviewed Newton in December 2001, within a month of the murder, Newton was coherent, his thoughts were orderly, and his mood was good. He did not exhibit signs of psychosis, psychotic delusions, PTSD, thought disorder, mood disorder, or a bipolar condition. In Dr. Oden's opinion, Newton's problems "related more to his personality disorder than anything else," and Newton did not have "any significant mental illness that was present at the time of the murder."

{¶ 115} (3) Dr. Sorrentino concluded that Newton "never was psychotic or lost touch with reality" and "has no symptoms of psychosis." Further, Dr. Sorrentino found that the psychological testing that was conducted "supports [finding] no psychotic process, no impaired reality testing."

{¶ 116} The expert witnesses agreed on the following: (1) Newton abused various drugs when they were available to him, i.e., when he was not in prison; (2) although Newton has displayed some symptoms of posttraumatic stress, PTSD was not established; and (3) Newton suffers from a personality disorder. Dr. Ort described this as a "Personality Disorder, whose features include Antisocial, Narcissistic, and Borderline traits." Dr. Oden described it as a mixed personality disorder with antisocial and borderline traits. According to Dr. Sorrentino, Newton has an antisocial-personality disorder with "borderline traits." Newton's medical records also confirm his personality disorder.

{¶ 117} The evidence at trial does not support a diagnosis of serious psychiatric problems. Dr. Ort did assert that Newton suffers from a mood disorder. But according to Dr. Sorrentino, Newton's mood symptoms are simply characteristics of his personality disorder. Thus, Dr. Sorrentino testified that "the mood symptoms, the sadness, the periods of feeling depressed arise from Mr. Newton's personality disorder." Dr. Oden found no evidence of a mood disorder and concluded that Newton's personality disorder explains a lot of his erratic behavior.

{¶ 118} We therefore accord no mitigating weight under R.C. 2929.04(B)(3).

{¶ 119} We do not find that the evidence supports any other statutory mitigating factors from R.C. 2929.04(B)(1) through (B)(6). As to "other factors," R.C. 2929.04(B)(7), Newton's cooperation with the Highway Patrol in its investigation of the murder and his plea of guilty to the offense as charged represent substantial mitigating factors. As we noted in *State v. Ashworth* (1999), 85 Ohio St.3d 56, 72, 706 N.E.2d 1231, "guilty pleas are traditionally accorded substantial weight in imposing a sentence."

{¶ 120} We also find that Newton's history of depression, his substance-abuse problems, and his antisocial- or borderline-personality disorder are relevant mitigating factors. Cf. *State v. Stojetz*, 84 Ohio St.3d at 472, 705 N.E.2d 329 (paranoid schizoid personality with antisocial tendencies and PTSD entitled to "modest mitigating weight"). We find no evidence of any other mitigating factors under R.C. 2929.04(B)(7).

{¶ 121} After weighing the aggravating circumstance against the collective mitigating evidence, we have concluded beyond a reasonable doubt that the aggravating circumstance outweighs the mitigation. Killing another while an inmate is a very grave aggravating circumstance. When weighed against the mitigating factors here, that aggravating circumstance outweighs Newton's mitigation evidence beyond any reasonable doubt. Newton has demonstrated that he is a menace to the life, health, and safety of others even when he is in protective custody in a maximum-security prison. We find the death penalty appropriate. Moreover, we find that imposing the death penalty in this case is proportionate when compared with other aggravated murders by inmates in which the defendants were sentenced to death. See, e.g., *State v. Sanders* (2001), 92 Ohio St.3d 245, 750 N.E.2d 90; *State v. Stojetz*, 84 Ohio St.3d 452, 705 N.E.2d 329; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585.

{¶ 122} Accordingly, we affirm the judgment of the common pleas court.

Judgment affirmed.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

James J. Mayer Jr., Richland County Prosecuting Attorney, John Randolph Spon Jr., Assistant Prosecuting Attorney; Jim Petro, Attorney General, and Michael L. Collyer and Kirsten L. Pscholka–Gartner, Assistant Attorneys General, for appellee.

David H. Bodiker, Ohio Public Defender, and Joseph E. Wilhelm, Stephen A. Ferrell, and Robert K. Lowe, Assistant Public Defenders, for appellant.