DECISION.
{¶ 1} De Ante Winfrey appeals his conviction for the murder of LaCola Burks. We affirm.
 The Shooting {¶ 2} A day after learning from his mother that her ex-boyfriend, LaCola Burks, had ripped out a clump of her hair during an argument, 16-year-old De Ante Winfrey called Burks to ask for a ride from Forest Park, Ohio, to his home in nearby Fairfield, Ohio.
 {¶ 3} When Burks arrived in his car, Winfrey's friend, Tracy Freeman, got into the rear seat, and Winfrey got into the front passenger seat. As Burks began to drive, Winfrey told him, "I'm salty at you," and then drew a handgun and pointed it at Burks' head. Winfrey pulled the trigger, but the gun did not fire. Winfrey pulled the trigger again, and it fired, striking Burks in the head.
 {¶ 4} Winfrey grabbed Burks' leg to push the brake pedal to stop the car. Then he and Freeman dragged Burks' body from the car and left it in the street.
 {¶ 5} Winfrey drove Freeman home in Burks' car, left the gun and ammunition with him, and then drove to his apartment in Fairfield. Winfrey changed his clothes and threw his bloodied clothes in a nearby dumpster. When his mother questioned him, Winfrey told her that he had shot and killed "Cola."
 {¶ 6} Winfrey's mother did not believe him, so she called Kellie Leach, Burks' then girlfriend, who falsely told her that Burks was at home. Leach hung up the telephone because she did not want to deal with Winfrey's mother. Winfrey told his mother that he did not understand how Burks could be home because he knew that he had shot Burks in the head. Winfrey's mother then called the police. *Page 3 
 Winfrey's Statements to Fairfield Police {¶ 7} Within three minutes of the dispatch, Fairfield Police Officer Michael Sulfridge arrived at the apartment complex where Winfrey lived with his mother and sister. Sulfridge saw Winfrey and his mother being searched by other officers in front of an apartment building.
 {¶ 8} After Winfrey had been handcuffed and placed in the back of a police cruiser, Sulfridge stood outside the cruiser and spoke to him through the open rear door. Sulfridge advised him of hisMiranda[1] rights by reading them verbatim from a card. When Sulfridge asked if he understood his rights, Winfrey nodded his head in an affirmative motion.
 {¶ 9} Sulfridge spoke to Winfrey for about three to five minutes. In that time, Winfrey said first that he had ridden home from Forest Park in a gold "T-bird," but then said that he had walked home. At no time during their conversation did Winfrey ask for a lawyer or indicate that he did not wish to talk.
 Winfrey's Statements to Forest Park Police {¶ 10} When Forest Park police officers arrived, they placed Winfrey in the rear of one of their cruisers. Fairfield officers told them that Winfrey had been advised of his Miranda rights. Forest Park Detective Adam Pape spoke with Winfrey's mother for 15 to 20 minutes before he spoke to Winfrey.
 {¶ 11} Pape advised Winfrey, "Just like you see on TV, you know you have the right to remain silent; you know you have the right to talk to an attorney before you talk to me. The court will give you one if you can't afford one. [Essentially] you have the right not to answer any questions until you have an attorney." But Pape *Page 4 
failed to inform Winfrey that anything he said could be used against him in court.[2] Pape asked Winfrey if he understood his rights, and Winfrey responded, "[Y]es[,] sir."
 {¶ 12} Winfrey told Pape that, the day before the shooting, his mother had told him not to talk with Burks anymore. She explained that, a week earlier, she and Burks had gotten into a fight, and that Burks had yanked some hair from her head. At that point, Winfrey began to plan what he was going to do to Burks. Winfrey obtained his mother's gun and practiced shooting it a few hours before he killed Burks.
 {¶ 13} Winfrey denied that anyone had been with him when he shot Burks. Winfrey told Pape where his own bloodied clothes were, and where Burks' car was parked. He also directed Pape to Freeman's house, where officers recovered the murder weapon.
 {¶ 14} Pape testified that he had interviewed Winfrey for about 30 to 40 minutes while he was in the back of the cruiser, and then for about 20 minutes when they arrived at the Forest Park police station. Then, a few hours later, Pape spoke to Winfrey for about a minute to ask him whether he had test-fired the gun before killing Burks.
 The Indictment and Conviction {¶ 15} Winfrey was indicted for aggravated murder[3] for purposely causing the death of Burks with prior calculation and design. He filed a motion to suppress the statements he had made to police. The trial court overruled the motion. *Page 5 
 {¶ 16} At trial, Winfrey did not deny that he had shot and killed Burks, but argued that he had committed the inferior-degree offense of voluntary manslaughter. Winfrey contended that, rather than acting with prior calculation, he had acted in a sudden fit of rage that had been brought on by serious provocation caused by Burks.
 {¶ 17} The jury found Winfrey guilty of murder. (We note, however, that the trial court's sentencing entry inaccurately reflects that Winfrey had "pleaded guilty" to the offense.) The trial court sentenced him to a prison term of 15 years to life for the murder, and to three years for an accompanying firearm specification.
 Motion to Suppress {¶ 18} In his first assignment of error, Winfrey argues that the trial court erred by overruling his motion to suppress the statements that he had made to police. Winfrey contends that he had not been properly advised of his rights, and that he had not knowingly and voluntarily waived his rights.
 {¶ 19} Appellate review of a motion to suppress presents a mixed question of law and fact.[4] In considering a motion to suppress, the trial court is in the best position to decide the facts and to evaluate the credibility of the witnesses.[5] Consequently, we must accept the trial court's findings of fact if they are supported by competent and credible evidence.[6] With respect to the trial court's conclusions of law, however, we apply a de novo standard of review to decide whether the facts satisfy the applicable legal standard.[7]
 {¶ 20} At the hearing on his motion to suppress, Winfrey acknowledged that Sulfridge had advised him of his rights and had asked if he understood, and that he had nodded his head "yes" in response. Winfrey said that, at the time of his *Page 6 
statements to police, he had not taken his prescription medication for attention deficit disorder.
 {¶ 21} An assistant principal from Winfrey's high school testified that Winfrey was an 11th grader, and that an individualized education program had been developed to address his deficits in reading, reading comprehension, and math skills. The principal testified that Winfrey was an average student, and that he would have had no trouble understanding or responding to a teacher's verbal instructions.
 {¶ 22} If police adequately advise a suspect of his Miranda rights before a custodial interrogation, the suspect need not be warned again before each subsequent interrogation.[8] "Police are not required to readminister the Miranda warnings when a relatively short period of time has elapsed since the initial warnings."[9] In this case, it is clear that Officer Sulfridge fully conveyed to Winfrey his rights as required by Miranda.
 {¶ 23} In less than an hour, Detective Pape readvised Winfrey of hisMiranda warnings, but omitted the warning that anything said could be used against him in court. Given the brief period of time between Sulfridge's complete recitation of the Miranda warnings and Pape's incomplete recitation of the warnings, we hold that, under the totality of the circumstances, the initial warnings remained effective for Pape's subsequent interrogations.[10]
 {¶ 24} And Winfrey did not need to expressly state that he was waiving his rights. "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."[11] Courts have upheld affirmative nods as valid indications that defendants understand their *Page 7 Miranda rights.[12] Accordingly, we hold that Winfrey's nod was a sufficient indicator of his waiver.
 {¶ 25} In determining whether a juvenile's statements have been voluntarily made, a court must consider "the totality of the circumstances, including the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; and the existence of physical deprivation or inducement."[13] The same considerations apply to whether the suspect understood and voluntarily waived his Miranda rights.[14] Evidence of police coercion or overreaching is a necessary predicate for a finding of involuntariness.[15]
 {¶ 26} Winfrey contends that his statement was not voluntarily made because Pape had lied to him during the interrogation. For example, when Winfrey asked whether Burks had died, Pape said no. In asking Winfrey where the murder weapon was located, Pape told him that there would be no questions asked of the person who had the gun. Pape also falsely told Winfrey that he admired him for what he had done. But an officer's lying to a suspect does not necessarily render a suspect's statement involuntary. "The use of deceit is merely ` * * * a factor bearing on voluntariness.'"[16]
 {¶ 27} At the time of his statements to police, Winfrey was 16 years old and in the 11th grade. Although he was enrolled in a special program for certain learning difficulties, he was an average student who was capable of understanding directions. According to a psychologist's report done shortly before the suppression hearing, Winfrey had reported that he "was involved in activities such as chess, doing jigsaw *Page 8 
puzzles, word puzzles, and boxing." Winfrey had held a job at a restaurant for several months prior to his arrest. Winfrey admitted that, when he was 14, he had begun selling numerous types of drugs, and that he had been able to woo clients from other dealers "because my product was better."
 {¶ 28} Winfrey's interviews with Sulfridge and Pape lasted only a few hours in total. At no point did he ask for an attorney or refuse to speak with the officers. Nor had Winfrey been subject to physical deprivation at the Forest Park police station. Under these circumstances, we cannot conclude that the trial court erred in its determination that Winfrey's statements were voluntarily made.
 {¶ 29} Winfrey also contends that, at the suppression hearing, the trial court erred by questioning a witness about information contained in a competency evaluation and by admitting the report into evidence. As the prosecutor noted, the evaluation had been completed at Winfrey's request, and defense counsel had stipulated to the report at a previous hearing.
 {¶ 30} Contrary to Winfrey's assertion, the report was not used against him on an issue of guilt, a use prohibited by R.C. 2945.371(J), but on the issues raised by Winfrey's motion to suppress. As Winfrey himself had raised the question of the knowing and voluntary nature of his waiver of rights, the trial court properly used his statements contained in the evaluation in its determination whether he had made a knowing waiver.
 {¶ 31} Accordingly, we overrule the first assignment of error.
 Prosecutorial Misconduct {¶ 32} In his second assignment of error, Winfrey argues that prosecutorial misconduct during closing argument deprived him of a fair trial. He contends that the prosecutor improperly compared him to Judas Iscariot and his conduct to "an *Page 9 
old Clint Eastwood movie." Winfrey failed to object in either instance, so he has waived all but plain error.[17]
 {¶ 33} At trial, Winfrey testified that when he and Freeman had gotten into Burks' car, he had joked with Burks that he needed to shave because he looked rough. Winfrey said that when he told Burks that he was "salty" at him, Burks "laughed. Then he looked at me like for what. And I got mad. * * * And I felt like he shouldn't have been laughing at that moment because I was serious." Winfrey said that he pulled the gun out and aimed it at Burks' head, "and it clicked, and he looked at the gun, and I noticed that the gun didn't have no bullet in it, and he turned back around and kept driving." So, Winfrey testified, "I felt like he thought I was playing, like is it a game or something. I felt like he was disrespecting me like, man, and then I shot it, and then everything went silent."
 {¶ 34} In response to the defense's argument that Winfrey had shot Burks because of Burks' conduct inside the car, the prosecutor argued that there had been no evidence presented that Winfrey had acted on any provocation by Burks. In discussing whether Winfrey had reacted to a serious provocation when Burks had remained silent, the prosecutor said, "In fact, what he [Winfrey] was doing was, essentially, saying to Cola [Burks], because he already had his mind made up about what he was going to do, essentially what he's saying is like an old Clint Eastwood movie, Give me a reason not to shoot you, Give me a reason not to shoot you. He was ready to shoot him. He just waited. Give me a reason not to. And Cola was quiet. So he kept on with what he had intended to do."
 {¶ 35} The defense also argued that there was no evidence that Winfrey had acted with prior calculation and design. According to Winfrey's testimony, when he and Freeman had gotten into Burks' car, everybody in the car shook hands. Defense *Page 10 
counsel argued, "Everybody in the car shakes hands. Do you do that when you're getting ready to shoot somebody? Everybody shakes hands?"
 {¶ 36} In response, the prosecutor argued, "And while we're on it, let's just talk about that shaking hands. I'm not trying to be scriptural on you, but I seem to recall Judas kissing Christ right before he handed him over. Okay. That's just baloney."
 {¶ 37} The test for prosecutorial misconduct in closing argument is "`whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' "[18]
"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."[19] We must review the challenged comments not in isolation, but in the context of the entire closing argument.[20]
 {¶ 38} With respect to the comparison to a "Clint Eastwood movie," we find nothing improper in the prosecutor's vague reference to an item of popular culture. Our analysis of the reference to Judas is more complicated. The Sixth Circuit Court of Appeals has taken up this subject a few times. In United States v. Steinkotter,[21] the prosecutor directly compared Steinkotter to Pontius Pilate and Judas Iscariot: "How can she now come in like Pontius Pilate and wash her hands of it? How can she like Judas Iscariot sit in there and enjoy refreshments with a lady whose death right then is being planned, and a bomb being planted?" Holding that the prosecutor's remarks were improper and prejudicial, the court reversed Steinkotter's conviction. *Page 11 
 {¶ 39} But in United States v. Frost,[22] the prosecutor noted that the defense had presented evidence of good character: "It's a bad thing for a man of good character to get into trouble. Benedict Arnold, when he betrayed his country, had as fine a character as any man in this Nation. Judas Iscariot, the disciple, when he betrayed his Lord, had as fine a character as anyone in the land, but unfortunate as it is, men who can show good character, which stands as a witness for them[,] frequently commit offenses against the law * * *." The court stated, "We do not approve of the prosecutor's references to Benedict Arnold and Judas Iscariot, names that connote, for many, singularly evil behavior."[23] But noting that defense counsel had failed to object, the court found no plain error in the prosecutor's references to either character. The court distinguished Steinkotter and relied on its earlier decision in United States v. Medlin[24] where the prosecutor had made a similar argument, because "the prosecution [had] used Benedict Arnold and Judas Iscariot as examples of men with good characters who had `gone bad' rather than as direct comparison models for defendants. "[25]
 {¶ 40} In this case, the prosecutor did not directly compare Winfrey to Judas Iscariot, but used the reference to point out a similar event involving a disingenuous greeting. Despite the ill-chosen analogy, we cannot say that the reference affected the outcome of the trial in this case. Accordingly, we overrule the second assignment of error. *Page 12 
 Weight and Sufficiency {¶ 41} In his third and fourth assignments of error, Winfrey argues that his murder conviction was against the manifest weight of the evidence and was not supported by sufficient evidence.
 {¶ 42} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[26] In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror."[27] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[28]
 {¶ 43} Winfrey contends that he shot Burks in a sudden fit of rage, and that, therefore, he should have been found guilty only of voluntary manslaughter, pursuant to R.C. 2903.03. But, Burks' laughter at Winfrey's "salty" comment, even if it had occurred, was not sufficient provocation for purposes of voluntary manslaughter.[29]
 {¶ 44} Following our review of the record, we hold that the state produced sufficient evidence of murder. The jury could have reasonably found that the close-range gunshot to Burks' head evinced a purpose to kill.[30]
 {¶ 45} Moreover, our review of the record does not persuade us that the jury clearly lost its way and created a manifest miscarriage of justice in finding *Page 13 
Winfrey guilty of the offense. Accordingly, we overrule the third and fourth assignments of error.
 Right to Confrontation {¶ 46} In his fifth assignment of error, Winfrey contends that the trial court erred by allowing the prosecutor to admit a hearsay statement at trial, in violation of Crawford v. Washington.[31]
Winfrey argues that the court should not have admitted into evidence a taped statement made by his mother on the night of the shooting.
 {¶ 47} But Winfrey's mother, the declarant, appeared for cross-examination at trial, so the Confrontation Clause of theSixth Amendment to the United States Constitution did not bar admission of the statement.[32] Accordingly, we overrule the fifth assignment of error.
 Psychologist's Testimony {¶ 48} In his sixth assignment of error, Winfrey argues that the trial court erred by refusing to allow a psychologist to testify for the defense concerning his mental state as it related to the inferior-degree offense of voluntary manslaughter.
 {¶ 49} It is well settled that where a defendant does not assert an insanity defense, he may not offer expert testimony to show that he lacked the mental capacity to form the specific mental state required for the crime.[33] So to the extent that Winfrey attempted to show that he had not acted purposely in causing Burks' death, the trial court properly excluded expert testimony concerning his diminished capacity. *Page 14 
 {¶ 50} We must further consider the proffered use of expert testimony with respect to Winfrey's attempt to demonstrate the mitigating factors of voluntary manslaughter. A person commits voluntary manslaughter if he knowingly causes the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force."[34]
 {¶ 51} The question of how much provocation is reasonably sufficient must be broken down into two distinct inquiries.[35] First, an objective standard must be applied to determine if the provocation "was sufficient to arouse the passions of an ordinary person beyond the power of his or her control." If the objective standard is met, the inquiry shifts to a subjective standard to determine if the defendant was actually under the influence of sudden passion or in a sudden fit of rage. It is at this point that the defendant's mental state and surrounding circumstances are considered. So if the objective standard of reasonable provocation is not satisfied, "no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted."
 {¶ 52} In State v. Shane, the Ohio Supreme Court held that, in most situations, words alone do not constitute reasonably sufficient provocation to incite the use of deadly force.[36] As we have already pointed out, Burks' laughter at Winfrey's "salty" comment, even if it had occurred, was not objectively sufficient provocation for purposes of voluntary manslaughter. Due to the failure to satisfy the objective portion of the question of reasonably sufficient provocation, the question of Winfrey's mental state was not triggered. Accordingly, we hold that the trial court did not abuse its discretion by refusing to allow expert testimony on Winfrey's *Page 15 
mental state. We overrule the sixth assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
SUNDERMANN, P.J., and CUNNINGHAM, J., concur.
[1] Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602.
[2] See id. at 479.
[3] R.C. 2903.01(A).
[4] State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372,797 N.E.2d 71, ¶ 8.
[5] State v. Mills (1992), 62 Ohio St.3d 357, 366,582 N.E.2d 972.
[6] State v. Fanning (1982), 1 Ohio St.3d 19, 437 N.E.2d 583.
[7] Burnside, supra, at ¶ 8.
[8] State v. Treesh, 90 Ohio St.3d 460, 470, 2001-Ohio-4,739 N.E.2d 749.
[9] Id., citing State v. Mack, 73 Ohio St.3d 502, 513-514,1995-Ohio-273, 653 N.E.2d 329.
[10] State v. Roberts (1987), 32 Ohio St.3d 225, 232,513 N.E.2d 720.
[11] North Carolina v. Butler (1979), 441 U.S. 369, 373,99 S.Ct. 1755.
[12] See United States v. Graves (Feb. 24, 1997), C.A.4 Nos. 95-5950 and 95-5951; United States v. Tutino (C.A.2, 1989), 883 F.2d 1125, 1138;United States v. Islam (Apr. 28, 2006), D.Conn. No. 3:04 CR 305.
[13] In re Watson (1989), 47 Ohio St.3d 86, 548 N.E.2d 210, paragraph one of the syllabus.
[14] See State v. Green, 90 Ohio St.3d 352, 366, 2000-Ohio-182,738 N.E.2d 1208.
[15] State v. Hill, 64 Ohio St.3d 313, 318, 1992-Ohio-43,595 N.E.2d 884, citing Colorado v. Connelly (1986), 479 U.S. 157, 164,107 S.Ct. 515.
[16] State v. Cooey (1989), 46 Ohio St.3d 20, 27, 544 N.E.2d 895, citing Schmidt v. Hewitt (C.A.3, 1978), 573 F.2d 794, 801; see, also,Frazier v. Cupp (1969), 394 U.S. 731, 739, 89 S.Ct 1420.
[17] State v. Tenance, 109 Ohio St.3d 255, 2006-Ohio-2417,847 N.E.2d 386, ¶ 49, citing State v. demons, 82 Ohio St.3d 438, 451,1998-Ohio-406, 696 N.E.2d 1009.
[18] State v. Hessler, 90 Ohio St.3d 108, 125, 2000-Ohio-30,734 N.E.2d 1237, quoting State v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883.
[19] Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940.
[20] State v. Keenan (1993), 66 Ohio St.3d 402, 410,613 N.E.2d 203.
[21] (C.A.6, 1980), 633 F.2d 719.
[22] (C.A.6, 1990), 914 F.2d 756, 770-771.
[23] Id. at 771.
[24] (C.A.6, 1965), 353 F.2d 789.
[25] Id.
[26] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[27] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[28] Id.
[29] See, e.g., State v. Elmore, 111 Ohio St.3d 515, 2006-Ohio-6207,857 N.E.2d 547, ¶ 83 (holding that words alone did not provide sufficient provocation to warrant an instruction on voluntary manslaughter).
[30] See Treesh, supra, at 485.
[31] (2004), 541 U.S. 36, 124 S.Ct. 1354.
[32] Id. at 59, fn. 9; see, also, State v. Gaines, 1st Dist. Nos. C-040122 and C-040139, 2005-Ohio-3032, paragraph three of the syllabus.
[33] State v. Cooey (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895.
[34] R.C. 2903.03.
[35] State v. Shane (1992), 63 Ohio St.3d 630, 634-635,590 N.E.2d 272.
[36] Id., paragraph two of the syllabus. *Page 1