[Cite as *State v. Porter*, 2012-Ohio-1526.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
MEIGS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No.   10CA15 |
| vs. | : | |
| MICHAEL W. PORTER, | : | DECISION AND JUDGMENT ENTRY |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

COUNSEL FOR APPELLANT:      Timothy Young, Ohio Public Defender, and Jeremy J. Masters, Ohio Assistant Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215

COUNSEL FOR APPELLEE:      Colleen S. Williams, Meigs County Prosecuting Attorney, and Amanda Bizub-Franzmann, Meigs County Assistant Prosecuting Attorney, 117 West Second Street, Pomeroy, Ohio 45769

_____

CRIMINAL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED: 3-30-12

ABELE, P.J.

{¶ 1}   This is an appeal from a Meigs County Common Pleas Court judgment of conviction and sentence.   A jury found Michael W. Porter, defendant below and appellant herein, guilty of: (1) assault in violation of R.C. 2903.11(A); (2) assault on a peace officer in violation of R.C. 2903.11(A); and (3) domestic violence in violation of R.C. 2919.25(A).

{¶ 2}   Appellant assigns the following errors for review:

FIRST ASSIGNMENT OF ERROR:

"THE STATE'S MISCONDUCT DURING ITS OPENING AND CLOSING ARGUMENTS DENIED MR. PORTER A FAIR TRIAL AND DUE PROCESS OF LAW, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION."

SECOND ASSIGNMENT OF ERROR:

"TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT TO THE STATE'S IMPROPER STATEMENTS DURING ITS OPENING AND CLOSING ARGUMENT."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT VIOLATED MR. PORTER'S RIGHT TO DUE PROCESS WHEN THE COURT INCLUDED A SANCTION IN MR. PORTER'S SENTENCING ENTRY THAT WAS NOT IMPOSED IN OPEN COURT DURING THE SENTENCING HEARING."

{¶ 3}   On August 16, 2010, appellant's wife, Joann Porter, appeared at the Meigs County Sheriff's Office.   She had several noticeable injuries.   In a written statement, Ms. Porter reported that appellant had choked her to the point that she passed out and urinated on herself.   She further claimed that appellant had threatened to cut her throat with a knife and had threatened to shoot everyone in the house if she called law enforcement.   Four deputies then proceeded to the residence that appellant shared with Ms. Porter and their children.

{¶ 4}   Once the deputies arrived at the residence, they struggled to control appellant. During the struggle, appellant closed a door on Deputy Griffin's hand, which resulted in cuts, bruises, and swelling to his hand.   The deputies eventually subdued appellant and arrested him.

{¶ 5}   On August 23, 2010, a Meigs County Grand Jury returned an indictment that charged appellant with: (1) felonious assault in violation of R.C. 2903.11(A)(1); (2) assault on a peace officer in violation of R.C. 2903.11(A); and (3) domestic violence in violation of R.C. 2919.25(A).   Appellant entered a not guilty plea.

{¶ 6}   On November 9 and 10, 2010, the trial court held a jury trial.   During the prosecutor's opening statement, the prosecutor explained the circumstances leading up to appellant's arrest as follows:

> "[T]he two officers on duty called for backup * * *.   You're going to hear from the officers that they were in uniform.   They were in cruisers that were marked.   They identified themselves when they knocked on the door; that they had their service weapons out because of the situation they were going into.   You're going to hear how Mr. Porter opened the door, yelled at them.   The deputies tried to take control of him.   Four deputies tried to take control of Mr. Porter and he slammed the door on the deputies.   He slammed the door and he caught Deputy Griffin in the door jamb, specifically his hand.
> Now if any of you have seen the movie Serpico.   It's an old movie with Al Pacino playing the Serpico character.   Serpico was a police officer.   It's a real story.   In the 1970s, '60 and 1970s in New York City and the movie opens with Detective Serpico being jammed in the door jamb and then the assailant from behind shooting him in the head in the door jamb.   You'll hear Deputy Griffin and you're going to see pictures of his hand.   Deputy Griffin had to go to the hospital. But before Deputy Griffin went to the hospital, officers managed to force the door open and try and take control of Mr. Porter.   You're going to hear that Mr. Porter wouldn't even submit at that point.   That Mr. Porter actually had to have a taser put to him.   At that point is when he submitted."

{¶ 7}   The prosecution's first witness, Meigs County Sheriff's Deputy Sergeant Edward E. Patterson, testified that on August 16, 2010 he was summoned to meet Sergeant Gilkey and Deputy Griffin at appellant's house.   Sergeant Patterson explained that he drove to appellant's house in his marked cruiser and that when the deputies arrived at appellant's house, they knocked on the door and identified themselves.   Sergeant Patterson testified that the deputies knocked a few times

before appellant opened the door "a short ways." He stated that the deputies yelled, "Sheriff's Department. Let us see your hands. Keep your hands where we can see them." Sergeant Patterson testified that appellant did not comply, but instead attempted to shut the door. Sergeant Patterson stated that the encounter turned into a door-shoving match, with the deputies trying to open the door and appellant trying to shut the door. Sergeant Patterson stated that during this door-shoving match, appellant pushed the door closed and caught Deputy Griffin's hand in the door. Eventually, officers forced the door open, but appellant continued to resist the deputies' orders. Sergeant Patterson explained that the deputies had to use a taser to subdue appellant. He stated that after the deputies handcuffed appellant, they performed a "safety sweep" and located knives on the counter close to the door and approximately six firearms throughout the house.

{¶ 8} Meigs County Sheriff's Deputy Sergeant Scott Trussell was also present at appellant's house. Like Sergeant Patterson, Sergeant Trussel stated that the deputies knocked on the door and identified themselves. He stated that when appellant opened the door, "he told [the deputies] to put the guns away." He likewise explained that a door-shoving match ensued in the deputies' attempt to obtain control over appellant and resulted in injury to Deputy Griffin's hand.

{¶ 9} Deputy Mark Griffin's testimony largely mirrored Sergeants Patterson's and Trussel's. He stated that when the deputies arrived at appellant's residence, they knocked and announced their presence. Deputy Griffin stated that appellant opened the door and Sergeant Trussel stated, "Let me see your hands. Step outside." Deputy Griffin explained that when appellant did not comply, Sergeant Trussel reached in the door to grab appellant's arm, but appellant pulled away and slammed the door shut. Deputy Griffin explained that at one point, he reached his hand inside the door and then appellant slammed the door shut on his hand. Deputy

Griffin stated that he suffered bruised and swollen knuckles and "busted skin." He further testified that he had problems using his hand for a few days after the injury.

{¶ 10} Ms. Porter testified that she went to the Sheriff's Office on August 16, 2010 to use the phone. She explained that once at the Sheriff's Office, she used the restroom and discovered bruises on her body. She stated that the deputies photographed her injuries. She testified that she does not recall telling the deputies who caused her injuries on August 16, 2010, but she noted that her written statement that she gave the deputies on August 16 states that appellant caused the injuries. She further recognized that her written statement advised that: (1) appellant choked her until she was unconscious and had urinated on herself; and (2) appellant stated he was going to cut her throat with a knife. At trial, however, she stated that her husband did not choke her. She stated that the bruises on her neck resulted from "a fit" she had on her bed. She explained: "I threw a fit on our bed. * * * I remember sitting on my bed shaking my head because there was no wall beside me and I could feel my tongue smacking on my cheeks." The prosecutor then advised Ms. Porter that she did not answer his question regarding how she got the bruises on her neck. The court then advised that she could answer how she got the bruises on her neck, if she knew. Ms. Porter stated that she did not know. Ms. Porter also denied that her husband rendered her unconscious. She admitted, however, that her written statement had advised the deputies that she requested an ambulance when she "came to."

{¶ 11} Ms. Porter also could not recall what appellant stated to her after she informed him that she "needed to call [her] dad," but she recognized that her written statement informed the deputies that appellant told her to pack her stuff and leave the house. Her statement further advised that appellant told her that if she called the police, he would shoot everyone and no one

would come out alive.   She explained that she then went to the Sheriff's Office to call her father, she was screaming and crying hysterically when she arrived at the Sheriff's Office.

{¶ 12} When questioned further about her injuries, Ms. Porter again stated that she did not know how she received them.   She also admitted that she recalls telling the deputies that appellant choked her, but she does not remember telling the deputies that she passed out or urinated on herself.   When appellant's counsel questioned her, she denied that appellant caused her any injuries and stated that she suffers from mental problems that caused her to cast blame upon her husband.

{¶ 13} Appellant testified in his defense and stated that he does not know how Deputy Griffin hurt his hand.   He claimed that he did not realize anyone's hand was in the door and still does not know if that is actually what happened.   Appellant also denied that the deputies identified themselves upon their arrival at his doorstep.

{¶ 14} On November 12, 2010, the jury found appellant guilty of assault;[1] (2) assault on a peace officer; and (3) domestic violence.

{¶ 15} On November 15, 2010, the trial court merged the assault and domestic violence convictions and sentenced appellant to serve 180 days in jail.   On November 24, 2010, the court sentenced appellant to serve eighteen months in prison for the assault on a peace officer conviction, with the remaining 180 days of appellant's domestic violence sentence to be suspended and appellant be placed on community control for five years upon his release from prison for the assault on a peace officer conviction.   The court additionally ordered appellant to perform five

---

[1] During trial, the court reduced the felonious assault charge to simple assault.   The court apparently determined that the prosecution failed to present sufficient evidence of serious physical harm.

hundred hours of community service as part of his community control.   This appeal followed.

I

{¶ 16}  In his first assignment of error, appellant asserts that the prosecutor's alleged inappropriate statements during opening statements and closing arguments constitutes prosecutorial misconduct.   Appellant complains that the state improperly compared appellant to the character from the movie Serpico, who shot an officer in the head through a partially opened door.   He specifically objects to the prosecutor's statements: (1) "That's how officers get killed"; and (2) "Thank God he didn't get one of them caught in the door and have a gun.   Easily have a dead officer.   Ladies, this is how officers get killed.   It's how people get killed."

{¶ 17}  Appellant further objects to the prosecutor's statement to the jury that the jury should think about what the jurors' family members would state if the jurors told them that they did not find appellant guilty.   Appellant claims that the prosecutor's statements were designed to inflame the jury.

{¶ 18}  Appellant further asserts that the prosecutor improperly expressed his personal belief or opinion regarding appellant's credibility or guilt by stating: "I submit to you that his behavior on the stand is evidence of itself that he's not telling you the truth here today.   He's certainly not telling the truth about 'oh, I didn't know they were officers.'"

{¶ 19}  We initially observe that appellant did not object to the allegedly improper statements.   Consequently, appellant has waived all but plain error.   State v. Lang, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶154, citing State v. Childs, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus; State v. Perez, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶181.   An alleged error is plain error only if the error is "obvious," State v.

Barnes, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), and "but for the error, the outcome of the trial clearly would have been otherwise." State v. Long, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Thus, for error to be plain, the error must be "'clearly outcome-determinative.'" Perez at ¶184, quoting State v. Sanders, 92 Ohio St.3d 245, 268, 750 N.E.2d 90 (2001); State v. Newton, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶93 ("Our review of the record discloses no outcome-determinative plain error."). In the prosecutorial misconduct context, plain error exists only when the record clearly shows that in the absence of the improper comments, the jury would not have convicted the defendant. State v. Conley, Pike App. No. 08CA784, 2009-Ohio-1848, ¶27, citing State v. Olvera-Guillen, Butler App. No. CA2007-05-118, 2008-Ohio-5416, ¶36, and State v. Rodgers, Trumbull App. No.2007-T-3, 2008-Ohio-2757, ¶44.

{¶ 20} When a defendant alleges prosecutorial misconduct, an appellate court must determine whether the comments were improper and, if so, whether the remarks prejudicially affected the substantive rights of the defendant. State v. Smith, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. Thus, "[n]ot every intemperate remark by counsel can be a basis for reversal." State v. Landrum, 53 Ohio St.3d 107, 112, 559 N.E.2d 710 (1990). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" Lang at ¶155, quoting Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 21} During closing arguments, the prosecution is given wide latitude to convincingly advance its strongest arguments and positions. State v. Phillips, 74 Ohio St.3d 72, 90, 656 N.E.2d

643 (1995); State v. Treesh, 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001). Nevertheless, the prosecutor must avoid going beyond the evidence presented to the jury in order to obtain a conviction. Smith, 14 Ohio St.3d at 14. "[P]rosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." State v. Fears, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). Further, an appellate court must not focus on isolated comments but must examine the prosecution's closing argument in its entirety to determine whether the prosecutor's comments prejudiced the defendant. Treesh, 90 Ohio St.3d at 466; State v. Keenan, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

{¶ 22} In the case sub judice, appellant first asserts that the prosecutor engaged in misconduct by comparing appellant to a character from the movie Serpico. In State v. Winfrey, Hamilton App. No. C-070490, 2008-Ohio-3160, the court considered a similar situation in which the prosecutor mentioned supposedly nefarious characters during closing arguments. In Winfrey, the jury found the defendant guilty of murder. Part of the defendant's defense was that he had not acted with prior calculation and design because he shook hands with the murder victim before shooting him. During closing argument, defense counsel asserted: "Everybody in the car shakes hands. Do you do that when you're getting ready to shoot somebody? Everybody shakes hands?" Id. at ¶35. In rebuttal, the prosecutor argued: "And while we're on it, let's just talk about that shaking hands. I'm not trying to be scriptural on you, but I seem to recall Judas kissing Christ right before he handed him over. Okay. That's just baloney." Id. at ¶36.

{¶ 23} The Winfrey court concluded that the prosecutor's indirect reference to Judas, while "ill-chosen," was not outcome-determinative. Id. at ¶40. In determining that the prosecutor's

comment did not amount to misconduct, the court explained: "[T]he prosecutor did not directly compare Winfrey to Judas Iscariot, but used the reference to point out a similar event involving a disingenuous greeting."   Id. at ¶40.

{¶ 24}  In reaching its conclusion, the Winfrey court relied upon two federal cases: United States v. Steinkotter, 633 F.2d 719 (C.A.6, 1980); and United States v. Frost, 914 F.2d 756 (C.A.6, 1990).   In Steinkotter, the Sixth Circuit Court of Appeals considered whether the prosecutor's references to Judas and Pontius Pilate constituted prosecutorial misconduct.   In Steinkotter, the prosecutor directly compared the defendant to Pontius Pilate and Judas Iscariot by stating: "How can she now come in like Pontius Pilate and wash her hands of it?   How can she like Judas Iscariot sit in there and enjoy refreshments with a lady whose death right then is being planned, and a bomb being planted?"   Id. at 720.   The Steinkotter court determined that the prosecutor's remarks "convey[ed] strong prejudicial overtones and ha[d] no place in a case being presented by [the United States]."   Id.   The court thus reversed the defendant's conviction.

{¶ 25}  In Frost, the court determined that the following remarks were not evidence of prosecutorial misconduct:   "It's a bad thing for a man of good character to get in trouble. Benedict Arnold, when he betrayed his country, had as fine a character as any man in this Nation. Judas Iscariot, the disciple, when he betrayed his Lord, had as fine a character as anyone in the land, but unfortunate as it is, men who can show good character, which stands as a witness for them[,] frequently commit offenses against the law * * *."   Id. at 770.   The Frost court distinguished Steinkotter by observing that in Steinkotter, the prosecutor directly compared the defendant to Judas and Pontius Pilate, whereas in Frost, the prosecutor merely offered the reference as an example of a person of fine character who nonetheless violates the law and did not directly

compare the defendant to either historical figure.   Although the Frost court distinguished Steinkotter, it disapproved "'of the prosecutor's references to Benedict Arnold and Judas Iscariot, names that connote, for many, singularly evil behavior.'" Id. at 771.   The court nonetheless determined that the statements did not amount to reversible error when defense counsel failed to object to the statements at trial.

{¶ 26} In the case sub judice, we are unable to conclude that the prosecutor's reference to the movie Serpico, even if ill-conceived, was outcome-determinative.   We observe that as in Winfrey and Frost, the prosecutor in the instant case did not directly compare appellant to the character from Serpico.   Instead, he offered the reference as an indirect example of how officers might become injured when suspects refuse to cooperate.   Moreover, we do not believe that any reasonable possibility exists that the jury would have found appellant not guilty in the absence of the prosecutor's Serpico references.   Our review reveals that the record contains overwhelming evidence of appellant's guilt.   All of the officers testified that appellant slammed the door on Deputy Griffin's hand.   There is no danger that the jury convicted appellant simply because the prosecutor indirectly referred to Serpico.

{¶ 27} Appellant next argues that the prosecutor engaged in misconduct by asking the jury to imagine what the jurors' family members would think if they explained the facts to their families and then stated that they found appellant not guilty.   He claims that the statement went beyond the evidence presented at trial, was designed to inflame the jury, and improperly expressed the prosecutor's personal opinion regarding appellant's guilt.

{¶ 28} In State v. Boler, Athens App. No. 09CA24, 2010-Ohio-3344, we considered a similar argument.   In Boler, the defendant asserted that the prosecutor improperly expressed an

opinion that the defendant was guilty.   The prosecutor argued to the jury that it would have "to believe and disbelieve witnesses in an odd and improbable fashion in order to credit" the defendant's arguments.   Id. at ¶29.   The prosecutor then stated:   "The defendant is guilty.   The facts meet the elements.   It does not matter for the murder charge who shot Donnie Putnam."   Id. at ¶28.

{¶ 29} We recognized that a prosecutor may not express a personal opinion or belief regarding a defendant's guilt or the credibility of a witness.   Id. at ¶26.   We further observed, however, that "'isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning.'" Id., quoting State v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶94.

{¶ 30} Thus, in Boler, we determined that when read in context, the prosecutor simply argued that the state's evidence was more reasonable and that because the state's evidence established the elements of the crime, the jury should return a verdict of guilty.   Id. at ¶29.   We therefore determined that the prosecutor did not engage in misconduct.

{¶ 31} Similarly, in the case at bar, when read in context, the prosecutor's suggestion to the jury that the jurors' families would act in disbelief if the jury found appellant not guilty was an argument that the state's evidence was more believable than the defendant's evidence and that the state's evidence established the elements of the crimes.   The prosecutor's comments followed his attempts to explain to the jury the concept of reasonable doubt, and his example of what the jurors' families might think was simply to illustrate the reasonable doubt concept.   The prosecutor asserted:

"[R]easonable doubt is one of those phrases of art.   And reasonable doubt is

something that you use in the most important of your decisions because these are important decisions. But if you go home tonight and you tell your loved ones about this trial and you say to them 'Well, this lady she came in to the Meigs County Sheriff's Office. She's got her six year old with her and she's got injuries. And she's upset but appropriately upset. She explains to the officers what happened. She gives them a written statement. The officers go out, four of them, full uniform, marked cruisers, pull up to a house, knock on the house, announce. Defendant opens the door, looks right at them, says "put your guns down." Officer reaches in to try and get a hold of him. Other officers are saying "show the hands." And defendant tries to shut the door. Officers getting in there. Officer's hand gets busted up. Door eventually gets shoved open. Defendant is still fighting with the officers so that one officer on each side.' You heard Deputy Griffin. You know, he benches 400 pounds. None of these officers are small men. None of them are particularly huge but none of them are particularly small. That a taser has to be deployed. And you heard Deputy Griffin saying four years he's never used his taser. But a taser has to be deployed by another officer. That 'oh, you know, he just, that's, you know, we thought well, you know, defendant got up, gave a self-serving statement. His wife got up on the stand and could only remember the parts that she wanted to remember but could remember other parts; could confirm that some of her statement was true but then disowned other parts but can't explain her injuries.' And you say "Well, we thought there was reasonable doubt.' They're going to look at you and say 'What are you talking about?'"

The prosecutor did not improperly state that he personally believed that the defendant was guilty. As such, we conclude that these arguments do not constitute prosecutorial misconduct.

{¶ 32} Appellant also complains that the prosecutor engaged in misconduct by improperly commenting upon appellant's truthfulness when testifying. He observes that the prosecutor stated: "I submit to you that his behavior on the stand is evidence of itself that he's not telling you the truth here today. He's certainly not telling the truth about 'oh, I didn't know they were officers.'"

{¶ 33} In Conley, this court determined that the prosecutor's comments to the jury that questioned whether appellant "told the complete and honest truth" and that suggested that his testimony may have been "rehearsed" did "not rise to the level necessary to establish that appellant has been deprived of a fair trial." Id. at ¶29. We found the prosecutor's suggestion that the

defendant's testimony may have been "rehearsed" disturbing, but nonetheless concluded that the "comments fell within the bounds of acceptable closing argument and * * * simply question[ed] whether a criminal defendant has been truthful." Id. at ¶30. We explained:

> "The prosecution is certainly free to point out discrepancies in the evidence and flaws in a defendant's version of evidence and evidence, but should refrain from using harsh terms or labels that may tend to limit or discourage the actual focus on the evidence. Appellant's argument, carried to its logical conclusion, would severely restrict the prosecution's ability to counter an accused's testimony if the accused denies involvement in a crime. Almost every comment a prosecutor might make with respect to such denial calls into question, at least implicitly, the accused's veracity. To hold that the prosecution can never pursue that particular line of argument would prevent a full examination and comment on the relevant evidence and work an unfair advantage for the defense."

Id. at ¶30.

{¶ 34} In the case sub judice, the prosecutor, similar to the prosecutor in Conley, merely pointed out discrepancies in appellant's testimony. The prosecutor stated:

> "[T]he defendant took the stand and he didn't have to take the stand, but he took the stand and because he took the stand, you need to look to what he said. You need to look to his candor, to his behavior on the stand.
> Ladies, I submit to you that his statements on the stand were contradictory. I submit to you that his behavior on the stand is evidence of itself that he's not telling you the truth here today. He's certainly not telling the truth about 'oh I didn't know they were officers.' You even heard at the end he starts backing off and going 'Well, I thought they probably might have been, might have been deputies.' Well, that's because his story that he started out in the beginning, he realized wasn't holding any (inaudible)."

Read in context, the prosecutor simply commented upon the flaws and discrepancies in appellant's version of events and suggested that appellant's claims could not have been truthful. Thus, the prosecutor did not engage in misconduct.

{¶ 35} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's first assignment of error.

II

{¶ 36} In his second assignment of error, appellant asserts that trial counsel rendered ineffective assistance of counsel by failing to object to the aforementioned instances of alleged prosecutorial misconduct.

{¶ 37} Criminal defendants have a right to counsel, including a right to the effective assistance from counsel. McMann v. Richardson, 397 U.S. 759, 770, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); State v. Stout, Gallia App. No. 07CA5, 2008–Ohio–1366, ¶21. To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Issa, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); State v. Goff, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." State v. Conway, 109 Ohio St.3d 412, 2006–Ohio–2815, 848 N.E.2d 810, ¶95 (citations omitted). "Failure to establish either element is fatal to the claim." State v. Jones, Scioto App. No. 06CA3116, 2008–Ohio–968, ¶14. Therefore, if one element is dispositive, a court need not analyze both. State v. Madrigal, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000) (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other").

{¶ 38} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. "A properly licensed attorney is presumed to execute his duties in an ethical and competent manner." State v. Taylor, Washington App. No. 07CA11, 2008–Ohio–482, ¶10, citing State v. Smith (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128. Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. State v. Gondor, 112 Ohio St.3d 377, 2006–Ohio–6679, 860 N.E.2d 77, ¶62; State v. Hamblin, 37 Ohio St.3d 153, 156, 524 N.E.2d 476 (1988).

{¶ 39} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that but for counsel's errors, the result of the trial would have been different. State v. White, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998); State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph three of the syllabus. Furthermore, courts may not simply assume the existence of prejudice, but must require that prejudice be affirmatively demonstrated. See State v. Clark, Pike App. No. 02CA684, 2003–Ohio–1707, ¶22; State v. Tucker, Ross App. No. 01CA2592 (Apr. 2, 2002); State v. Kuntz, Ross App. No. 1691 (Feb. 26, 1992).

{¶ 40} Trial counsel's failure to object to allegedly instances of prosecutorial misconduct "does not necessarily constitute ineffective assistance" of counsel. Perez at ¶230; State v. Tenace, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶62. Moreover, as we determined in appellant's first assignment of error, in the case sub judice we do not believe that the prosecutor did engage in misconduct. Therefore, appellant cannot demonstrate that trial counsel rendered ineffective assistance of counsel.

**{¶ 41}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's second assignment of error.

III

**{¶ 42}** In his third assignment of error, appellant contends that the trial court erred by imposing a sanction that the court did not impose during the sentencing hearing.   The prosecution agrees.

**{¶ 43}** Because the prosecution agrees that the trial court erred by imposing a sentence that it failed to pronounce at the sentencing hearing, we sustain appellant's third assignment of error, vacate the trial court's imposition of five hundred hours of community service and remand the matter to the trial court for re-sentencing.

> JUDGMENT AFFIRMED IN PART, VACATED IN PART AND REMANDED FOR RE-SENTENCING CONSISTENT WITH THIS OPINION.

Kline, J., concurring.

**{¶ 44}** I concur in judgment and opinion as to the first and second assignments of error.   I respectfully concur in judgment only, however, as to the third assignment of error.   In my view, we should not sustain an assignment of error simply because the appellee concedes the issue.   *See In re S.S.*, 4th Dist. No. 10CA682, 2011-Ohio-4081, ¶ 28-32 (overruling an appellant's assignment of error despite the state's concession).   Instead, we should determine whether prejudicial error actually occurred.   Here, I would sustain Porter's third assignment of error, but I would sustain it based on the applicable legal standards.

**{¶ 45}** Accordingly, I respectfully concur in judgment only as to the third assignment of

error.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed in part, vacated in part and remanded in part for further proceedings consistent with this opinion. Appellee and appellant shall equally share the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Meigs County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the sixty day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J.: Concurs in Judgment & Opinion

Kline, J.: Concurs in Judgment & Opinion as to Assignment of Errors 1 & 2; Concurs in

Judgment Only with Opinion as to Assignment of Error 3

For the Court

BY:_____

Peter B. Abele

Presiding Judge

**<u>NOTICE TO COUNSEL</u>**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the

time period for further appeal commences from the date of filing with the clerk.